UNDER SEAL



FILED ... DIVISION
CLERK, U.S. DISTRICT COURT

JUN - 8 2005

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

October 2004 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA, | SA CR **05 - 124** |
| Plaintiff, | I N D I C T M E N T |
| v. | [18 U.S.C. § 1962(d): |
| PETER OJEDA, aka "Sana," aka "The Senor," aka "The Big Homie," aka "The Homie," aka "The Old Man," aka "The S Man," MARCO DIAZ, aka "Slim," JOSE BECERRA, aka "Big Joe," RAFAEL TORRES, aka "Huero," DAVID MELGOZA, JR., aka "Lil' Sluggo," ANTHONY LEBRON, aka "Bala," RAMON MEZA, JR., aka "Capone," ABRAHAM MAGALLON, aka "Chema," JOSE ARVIZU, aka "Sonny," OSCAR RUIZ, aka "Snipes," aka "Sniper," JOSE RUIZ, aka "Baby Snipes," aka "Lil' Snipes," ISMAEL ESQUIVEL, aka "Bogart," MARIO SAUCEDO, aka "Clumsy," | Racketeer Influenced and Corrupt Organization Conspiracy; 21 U.S.C. § 846: Conspiracy to Possess with Intent to Distribute and Distribute Controlled Substances; 21 U.S.C. § 841(a)(1): Distribution of Methamphetamine] |



ENTER ON ICMS

JUN 10 2005



ORLANDO ALVARADO, aka )
"Little Trigger," )
FREDDIE OJEDA, aka "Slack," )
aka "Cricket," )
FRANK NERIDA, aka "Sneaky," )
DAVID TRUJILLO, aka "3D," )
ARTHUR DURAN, aka "Chino," )
ROBERT OCAMPO, aka )
"Wicked," )
FREDDIE LUEVANO, aka )
"Freaky," )
ABEL AZEVEDO, aka "Babs," )
JOSEPH CASTRO, )
LAWRENCE MORALES, aka )
"Larry," )
LONG NGUYEN, aka "Chino," )
ROBERT CERVANTES, aka )
"Gordo," )
JOSE MARTINEZ, aka "Huero," )
SANDRA FLORES, )
DIEGO MORENO, and )
MIA RODRIGUEZ, )
                                           )
                    Defendants.            )
                                           )

The Grand Jury Charges:

INTRODUCTORY ALLEGATIONS

THE RACKETEERING ENTERPRISE

1.    At all times relevant to this indictment:

PETER OJEDA, also known as ("aka") "Sana," aka "The Senor,"

aka "The Big Homie," aka "The Homie," aka "The Old Man," aka "The

S Man" ("P. OJEDA"), MARCO DIAZ, aka "Slim" ("DIAZ"), JOSE

BECERRA, aka "Big Joe" ("BECERRA"), RAFAEL TORRES, aka "Huero"

("TORRES"), DAVID MELGOZA, JR., aka "Lil' Sluggo" ("MELGOZA"),

ANTHONY LEBRON, aka "Bala" ("LEBRON"), RAMON MEZA, JR., aka

"Capone" ("MEZA"), ABRAHAM MAGALLON, aka "Chema" ("MAGALLON"),

JOSE ARVIZU, aka "Sonny" ("ARVIZU"), OSCAR RUIZ, aka "Snipes,"

aka "Sniper" ("O. RUIZ"), JOSE RUIZ, aka "Baby Snipes," aka "Lil'

2

Snipes," ("J. RUIZ"), ISMAEL ESQUIVEL, aka "Bogart" ("ESQUIVEL"), MARIO SAUCEDO, aka "Clumsy" ("SAUCEDO"), ORLANDO ALVARADO, aka "Little Trigger" ("ALVARADO"), FREDDIE OJEDA, aka "Slack," aka "Cricket" ("F. OJEDA"), FRANK NERIDA, aka "Sneaky" ("NERIDA"), and others, were members and associates of an organization headed by P. OJEDA that engaged in acts of extortion, conspiracy to commit extortion, assault, and aiding and abetting and conspiracy to aid and abet the distribution of narcotics, for monetary gain. This organization operated in the Central District of California, and will be referred to in this Indictment as the "Ojeda Organization."  The Ojeda Organization, including its leadership, membership, and associates, constituted an "enterprise," as defined by Title 18, United States Code, Section 1961(4) (hereinafter "the enterprise"), that is, a group of individuals associated in fact.  The enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise. This enterprise was engaged in, and its activities affected, interstate and foreign commerce.

<u>GENERAL BACKGROUND</u>

2.    At all times relevant to this indictment, P. OJEDA was a member of the Mexican Mafia, a powerful and violent prison gang that exerted control over drug distribution and other illegal activities within the California penal system, and exerted control over Hispanic street gangs and their members in southern California.

3.    As a member of the Mexican Mafia, or "carnal," P. OJEDA maintained the primary leadership role among Hispanic street gang

3

members in Orange County.

4.    FxTroop, Westside Anaheim, the Alley Boys, and
Fullerton Tokers Town were all Hispanic street gangs operating in
and around Orange County, within the Central District of
California.  The Ojeda Organization included high ranking and
intermediate level members of the FxTroop gang, as well as high
ranking members of Westside Anaheim, the Alley Boys, and
Fullerton Tokers Town.  Those gang members assisted P. OJEDA in
exerting his influence over Hispanic street gangs and their
members in Orange County.  The Ojeda Organization's influence
over Orange County Hispanic criminal street gangs and their
members extended from the streets of Orange County into the
Orange County Jail system and the California correctional system.

5.    The Ojeda Organization required Hispanic criminal
street gangs in Orange County to pay money as a "tax" or
"tribute" (hereinafter "tax") on a regular basis.  The tax was to
be a portion of the proceeds that each gang had earned from the
various criminal activities of its members.  The Ojeda
Organization permitted the tax-paying gangs and gang members to
exert influence over their neighborhoods and territories.

6.    The Ojeda Organization disciplined Orange County
criminal street gangs and their members who engaged in
unsanctioned violence, such as a drive-by shooting, which could
cause increased law enforcement attention and thereby threaten
the income of the Ojeda Organization.  The Ojeda Organization
also disciplined any gang member who committed an act of
disrespect to the Ojeda Organization, any of its members, or
persons protected by it.  This discipline could include a "green

4

light" on the offending gang or gang member, meaning the gang or gang member would be assaulted by members of the Ojeda Organization or those doing its bidding.  Alternatively, an offending gang or gang member would be required to pay a "penalty" tax to the Ojeda Organization.

7.   If any gang or gang member failed to pay a tax required by the Ojeda Organization, the Ojeda Organization would put a "green light" (authorization to assault) on the members of the gang who were out on the streets and those who were incarcerated, for example, in the Orange County Jail.  Members of the Ojeda Organization, or those doing its bidding, would then assault the offending gang or gang members.

8.   The Ojeda Organization taxed narcotics dealers in Orange County and elsewhere.  By paying the tax, the narcotics dealers were free to sell narcotics without interference from the Ojeda Organization.  In addition, if narcotics dealers paid significant amounts of money to the Ojeda Organization as taxes, the Ojeda Organization would aid and abet these narcotics dealers in their trafficking activities, including helping to collect drug debts owed to the dealers and intervening on behalf of the dealers in any disputes with customers, gang members, or any non-organization member seeking to impose taxes on the dealer.  As with the Hispanic street gangs, if a narcotics dealer failed to pay its required taxes, the Ojeda Organization would put a "green light" out on the dealer, meaning the dealer would be assaulted and/or forced to cease any narcotics trafficking activities.

9.   The Ojeda Organization also controlled the Hispanic inmate population of the Orange County Jail.  It authorized

5

certain incarcerated inmates to "run" the jail on behalf of the organization, which involved carrying out "green lights," i.e., assaults on inmates targeted by the organization, and collecting taxes from jail inmates conducting illegal activities inside the jail, such as narcotics trafficking.

<u>PURPOSES OF THE ENTERPRISE</u>

10.   The purposes of the enterprise included, but were not limited to, the following:

a.   Preserving, protecting, and expanding the power of the enterprise through the use of intimidation, violence, and threats of violence.

b.   Enriching the members of the enterprise through, among other things, the extortion of narcotics traffickers and gang members.

c.   Promoting and enhancing the enterprise and the activities of its members.

<u>ROLES OF THE DEFENDANTS</u>

11.   The defendants participated in the operation and management of the enterprise as follows:

a.   Defendants P. OJEDA, DIAZ, and BECERRA were leaders of the enterprise who directed other members of the enterprise in carrying out unlawful and other activities in furtherance of the conduct of the enterprise's affairs.

b.   Under the direction of the leadership of the enterprise, defendants TORRES, MELGOZA, LEBRON, MEZA, MAGALLON, ARVIZU, O. RUIZ, J. RUIZ, ESQUIVEL, SAUCEDO, ALVARADO, F. OJEDA, and NERIDA participated in unlawful and other activities in furtherance of the conduct of the enterprise's affairs.

## THE MEANS AND METHODS OF THE ENTERPRISE

12.   Among the means and methods by which the defendants and their associates conducted and participated in the conduct of the affairs of the Ojeda Organization were the following:

a.   Members of the enterprise and their associates committed, and attempted and threatened to commit, acts of violence, including assault, to protect and expand the enterprise's criminal operations.

b.   To generate income, members of the enterprise and their associates engaged in the extortion of narcotics traffickers and gang members.

c.   To perpetuate the enterprise, the members of the enterprise and their associates concealed from law enforcement the way in which the enterprise conducted its affairs, the locations at which enterprise members discussed and conducted the affairs of the enterprise, and the locations at which enterprise members maintained the proceeds of the extortion of narcotics dealers and gang members.

//
//
//
//
//
//
//
//
//
//

7

COUNT ONE

[18 U.S.C. § 1962(d)]

13. Paragraphs One through Twelve of this Indictment are realleged and incorporated by reference as though fully set forth herein.

14. Beginning on a date unknown to the grand jury, but at least since 2003, and continuing thereafter to on or about January 23, 2005, in Orange County, within the Central District of California, defendants P. OJEDA, DIAZ, BECERRA, TORRES, MELGOZA, LEBRON, MEZA, MAGALLON, ARVIZU, O. RUIZ, J. RUIZ, ESQUIVEL, SAUCEDO, ALVARADO, F. OJEDA, NERIDA, and others, being persons employed by and associated with the enterprise described in Paragraphs One through Twelve of this Indictment, that is, the Ojeda Organization, which enterprise was engaged in, and the activities of which affected, interstate and foreign commerce, knowingly and intentionally conspired to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, as that term is defined in Title 18, United States Code, Sections 1961(1) and 1961(5).

15. The pattern of racketeering activity through which the defendants P. OJEDA, DIAZ, BECERRA, TORRES, MELGOZA, LEBRON, MEZA, MAGALLON, ARVIZU, O. RUIZ, J. RUIZ, ESQUIVEL, SAUCEDO, ALVARADO, F. OJEDA, NERIDA, and others, agreed together and with each other, to conduct the affairs of the enterprise, consisted of multiple acts involving extortion, chargeable under the following provisions of state law:

a.   California Penal Code, Section 518 (extortion);

b.   California Penal Code, Sections 182, 518 (conspiracy to commit extortion);

and multiple acts involving narcotics trafficking, including methamphetamine, heroin, and other controlled substances, in violation of the laws of the United States, Sections 841(a)(1) and 846 of Title 21, United States Code.

16.   It was a further part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering in the conduct of the affairs of the enterprise.

<u>OVERT ACTS</u>

17.   In furtherance of the conspiracy and to accomplish the object of the conspiracy, the defendants and their co-conspirators committed the following overt acts, among others, in Orange County, within the Central District of California:

(1)   On or about January 31, 2004, defendant P. OJEDA, directed defendant DIAZ to contact Alley Boys gang member "Chito" regarding the collection of taxes from the Alley Boys gang.

(2)   On or about February 16, 2004, defendant P. OJEDA and defendant MELGOZA discussed MELGOZA's collection of taxes and made arrangements for P. OJEDA to pick up taxes from MELGOZA.

(3)   On or about February 23, 2004, defendant P. OJEDA and defendant DIAZ discussed the collection of taxes from Townsend Street gang member "Looney" and the collection of taxes from a narcotics dealer.

(4)   On or about February 27, 2004, defendant P. OJEDA directed defendant F. OJEDA to contact "Spy" from the Alley Boys

9

gang to arrange for "Spy" to pay taxes to P. OJEDA on behalf of the Alley Boys gang.

(5)  On or about February 27, 2004, defendant P. OJEDA spoke to "Spy" from the Alley Boys gang and arranged to collect taxes from "Spy."

(6)  On or about March 6, 2004, defendant P. OJEDA agreed to send a note to a California penal institution verifying an individual's membership in the Mexican Mafia.

(7)  On or about March 23, 2004, defendant P. OJEDA directed an unindicted co-conspirator to assault a narcotics dealer who had not been paying taxes to the Ojeda Organization and then tell the narcotics dealer the reason for the assault.

(8)  On or about March 28, 2004, defendant ARVIZU informed defendant DIAZ that he had collected taxes to give to DIAZ.

(9)  On or about March 31, 2004, defendant ARVIZU told defendant DIAZ that he contacted a narcotics dealer and informed the dealer that taxes would have to be paid to the Ojeda Organization.

(10)  On or about April 3, 2004, defendant P. OJEDA directed defendant DIAZ to contact a bail bondsman P. OJEDA sought to extort because the bail bondsman wanted to deal narcotics.

(11)  On or about April 3, 2004, defendant P. OJEDA extorted a bail bondsman for $500 in return for allowing the bail bondsman to deal narcotics with permission of the Ojeda Organization.

(12)  On or about April 24, 2004, defendant P. OJEDA

and DIAZ discussed the extortion of a 7th Street gang member who conducted a drive-by shooting and wounded an FxTroop gang member.

(13)  On or about April 24, 2004, defendant F. OJEDA informed defendant P. OJEDA that he had received $2000 in taxes paid by the father of the 7th Street gang member who wounded an FxTroop gang member during a drive-by shooting.

(14)  On or about April 30, 2004, defendant P. OJEDA directed defendant DIAZ to investigate a drive-by shooting by Hard Times gang members in which a little boy was killed.

(15)  On or about May 13, 2004, defendant DIAZ spoke with Orange County Jail inmate "Popeye" about "Popeye" being assaulted by "Big John" from the Santa Nita gang, and DIAZ discussed giving "Popeye" control of an area of the jail but told "Popeye" to wait until DIAZ discussed it with an unindicted co-conspirator who was running a portion of the jail for the Ojeda Organization.

(16)  On or about May 13, 2004, defendant DIAZ told an unindicted co-conspirator who was an Orange County Jail inmate to assault an inmate named "Jimbo" on direct orders from defendant P. OJEDA and to assault an inmate named "Johnny" for assaulting "Popeye," who was handling business for P. OJEDA in the jail.

(17)  On or about May 15, 2004, defendant O. RUIZ told defendant DIAZ that he informed "Amy," a narcotics dealer, she would need to pay more in taxes to the Ojeda Organization if she wanted to have O. RUIZ collect drug debts for her.

(18)  On or about May 20, 2004, defendant DIAZ told an unindicted co-conspirator and Alley Boys gang member incarcerated in the Orange County Jail that defendant P. OJEDA was upset

11

because Alley Boys gang member "Chito" had stopped paying taxes to P. OJEDA and DIAZ, and that the Alley Boys needed to have one of its members resume paying taxes to P. OJEDA. In addition, DIAZ directed the unindicted co-conspirator to tell another unindicted co-conspirator also incarcerated inside the jail, that prior to the other unindicted co-conspirator taking any action on behalf of the Ojeda Organization, the other unindicted co-conspirator had to check with DIAZ and P. OJEDA, because P. OJEDA was unhappy with some recent actions taken inside the jail which reflected badly on the Ojeda Organization out on the streets.

(19)  On or about May 24, 2004, defendant O. RUIZ informed defendant DIAZ that narcotics dealer "Amy" refused to pay taxes and DIAZ directed O. RUIZ to steal her car temporarily as punishment.

(20)  On or about May 28, 2004, defendant O. RUIZ informed defendant DIAZ that he had been unable to find narcotics dealer "Amy" and DIAZ and O. RUIZ discussed assaulting "Amy's" boyfriend as punishment for her not paying her taxes.

(21)  On or about May 30, 2004, defendants P. OJEDA and MELGOZA discussed what the penalty should be for a non-Ojeda Organization member who was trying to extort taxes from a narcotics trafficker protected by the Ojeda Organization.

(22)  On or about June 9, 2004, defendant P. OJEDA and M. DIAZ discussed P. OJEDA's extortion of a bail bondsman who wanted permission from the Ojeda Organization to deal narcotics, and DIAZ reminded P. OJEDA to inform the bail bondsman where he could engage in narcotics trafficking and to tell the bail bondsman that he could not interfere with any other narcotics

12

traffickers operating in that area.

(23)  On or about June 13, 2004, defendant ALVARADO, calling from the Orange County Jail, left a voicemail message for defendant DIAZ, wherein ALVARADO informed DIAZ that he would make sure tax money collected from inside the jail would be sent to DIAZ and requested clarification regarding the green light status on the 17th Street gang.

(24)  On or about June 17, 2004, defendants SAUCEDO and DIAZ discussed DIAZ putting a green light on an El Modena gang member who had disrespected SAUCEDO's wife and daughter and how much the gang member would have to pay to have the green light canceled.

(25)  On or about June 17, 2004, defendant ALVARADO, calling from the Orange County Jail, and defendant DIAZ discussed the status of green lights on various gangs, including the 17th Street gang, and gang members in the jail.

(26)  On or about June 18, 2004, defendant DIAZ told an unindicted co-conspirator in the Orange County Jail that defendant ALVARADO was now collecting taxes for P. OJEDA inside the jail and that everything ALVARADO collected was going directly to P. OJEDA.  DIAZ also told the unindicted co-conspirator that jail inmates "Baby" and "Wacko" were getting assaulted in the jail pursuant to green lights.

(27)  On or about June 18, 2004, defendant MEZA informed defendant DIAZ that he had collected $200 in taxes from a narcotics trafficker, and MEZA and DIAZ discussed raising the amount of taxes owed by the narcotics trafficker.

(28)  On or about June 25, 2004, defendant DIAZ and an

13

unindicted co-conspirator in the Orange County Jail discussed
Ojeda Organization business, including a problem with non-gang
affiliated Mexican nationals in the jail who were trying to
organize, the green light status of certain gang members, and
problems with getting tax money out of the jail to DIAZ.

(29)  On or about August 24, 2004, defendants DIAZ and
MELGOZA discussed assigning tax collection duties to gang members
"Chino" from the Delhi gang and "Cartoon" from the Lopers gang.

(30)  On or about September 2, 2004, defendant DIAZ
directed defendant MAGALLON to find out the last name of an
Eastside gang member named "Joe" because "Joe" had not been
paying his taxes.

(31)  On or about September 2, 2004, defendant DIAZ told
an unindicted co-conspirator in the Orange County Jail that
another unindicted co-conspirator had been stripped of his
authority in the jail and should be getting assaulted once a week
because of his mistakes.

(32)  On or about September 3, 2004, defendants MELGOZA
and DIAZ discussed a problem with "Cruz," who was attempting to
tax "Ernie," a narcotics trafficker protected by the Ojeda
Organization, at "Ernie's" place of business, and DIAZ directed
MELGOZA to inform "Cruz" that "Ernie" was paying taxes to
defendant P. OJEDA and that "Cruz" could not do anything at that
location.

(33)  On or about September 9, 2004, defendant BECERRA
told defendant DIAZ that he was going to tax a drug dealer who
had stolen $150,000, and that he wanted a Pauline Street gang
member to rob a drug connection in order to get out of a green

14

light.

(34)  On or about September 16, 2004, defendants ESQUIVEL and MELGOZA went into Lopers gang territory to meet with "Cartoon" regarding a tax collection issue.

(35)  On or about September 18, 2004, defendant DIAZ put defendant TORRES in charge of Module K in the Orange County Jail and arranged for TORRES to get collected tax proceeds from inside the jail to DIAZ.

(36)  On or about September 19, 2004, defendant DIAZ told defendant BECERRA that DIAZ had put defendant LEBRON in charge of collecting taxes from the Travelers gang in Anaheim.

(37)  On or about September 19, 2004, defendant SAUCEDO, calling from the Orange County Jail, told defendant DIAZ that SAUCEDO was having a problem with an inmate named "Spider," who was trying to put a green light on another inmate without getting the proper authority from DIAZ, and DIAZ directed SAUCEDO to tell "Spider" to calm down or he would face the consequences.

(38)  On or about September 21, 2004, defendant J. RUIZ informed defendant DIAZ that the gang members from the Devious Hoodlums gang wanted to pay money to have the green light taken off the gang.

(39)  On or about September 21, 2004, defendant DIAZ directed an unindicted co-conspirator in the Orange County Jail to put a green light on Pauline Street gang members in the jail.

(40)  On or about September 22, 2004, defendant DIAZ told defendant J. RUIZ that he would obtain some firearms for him, and DIAZ and J. RUIZ agreed that they would meet with gang members from the Devious Hoodlums gang that night to resolve the

15

green light status of the gang.

(41)   On or about September 26, 2004, defendant LEBRON informed defendant DIAZ that an Anaheim gang member named "Capone" was concerned about a green light put on one of his fellow gang members, and that "Capone" had made arrangements to pay a drug debt owed to "Ernie," a narcotics dealer protected by the Ojeda Organization, by trading a car for the debt.

(42)   On or about September 28, 2004, defendant DIAZ told defendant SAUCEDO, who was inside the Orange County Jail, that the Under No Authority ("UNA") gang had a green light and that a UNA gang member inside the jail should be getting a beating once a week and not three times a day.

(43)   On or about September 29, 2004, defendant DIAZ instructed defendant LEBRON to deliver to his residence the car being traded by "Capone" for the drug debt owed to "Ernie," a narcotics dealer protected by the Ojeda Organization.

(44)   On or about October 2, 2004, defendant LEBRON informed defendant DIAZ that LEBRON told an Anaheim South Side Killers ("SSK") gang member that they had to pay taxes to the Ojeda Organization.

(45)   On or about October 8, 2004, defendant TORRES called defendant DIAZ from the Orange County Jail and informed DIAZ that he had $500 in tax proceeds collected from "Tito" from La Habra, and DIAZ directed TORRES to have "Tito" assaulted once a week until "Tito" paid off his debt for using the name of defendant P. OJEDA without permission.

(46)   On or about October 10, 2004, defendant MELGOZA discussed with defendant DIAZ whether DIAZ was going to put

16

MELGOZA in charge of dealing with "Cartoon" on a tax collection issue, because "Cartoon" felt more comfortable dealing with MELGOZA rather than defendant ESQUIVEL.

(47)  On or about October 11, 2004, defendant DIAZ and defendant BECERRA discussed BECERRA taxing a suspected narcotics dealer named "Bubba" from the Anaheim Vatos Locos gang, and BECERRA updated DIAZ on BECERRA's efforts to collect taxes from the La Jolla gang and the Atwood gang.

(48)  On or about October 16, 2004, defendant MEZA told defendant DIAZ that MEZA was surveilling a narcotics trafficker's house and observing the volume of business so that the Ojeda Organization could determine how much to tax the trafficker.

(49)  On or about October 16, 2004, defendant J. RUIZ informed defendant DIAZ that he had collected money from a Devious Hoodlum gang member and would give the money to DIAZ.

(50)  On or about October 16, 2004, defendant DIAZ spoke with "Husky" from the Only the Hoodlums ("OTH") gang, who was calling on behalf of "Tito," a La Habra gang member. "Husky" told DIAZ that "Tito" wanted to know what he could do to get the green light taken off his gang, and DIAZ said he would have discuss the situation with defendant P. OJEDA.

(51)  On or about October 28, 2004, defendant BECERRA told defendant DIAZ that a gang member named "Bull" from 17th Street had taken money and a shotgun from a suspected narcotics dealer who had not been paying taxes to the Ojeda Organization, and DIAZ told BECERRA to give the money to defendant P. OJEDA. BECERRA also informed DIAZ that he had eight firearms stored if they needed them.

17

(52) On or about October 30, 2004, defendant DIAZ directed defendant ESQUIVEL to tell "Cartoon" to contact DIAZ because DIAZ wanted to talk to "Cartoon" about a tax collection issue.

(53) On or about November 1, 2004, defendants DIAZ and BECERRA discussed taxing two 17th Street gang members.

(54) On or about November 1, 2004, defendant TORRES called defendant DIAZ from the Orange County Jail and TORRES and DIAZ discussed the green lights on the BNP gang, the UTA gang, the Pauline Street gang, and two inmates named "Speedy" and "Lefty."

(55) On or about November 6, 2004, defendant LEBRON told defendant DIAZ that he spoke to defendant P. OJEDA and P. OJEDA told him to tax the "SSK" gang members $1,000.

(56) On or about November 11, 2004, defendant DIAZ informed defendant LEBRON that defendant P. OJEDA had ordered that defendant BECERRA would now be collecting taxes from Anaheim gangs instead of LEBRON.

(57) On or about November 12, 2004, defendants DIAZ and NERIDA discussed NERIDA's attempts to collect taxes from a narcotics dealer.

(58) On or about November 13, 2004, defendant J. RUIZ informed defendant DIAZ that "Creeper" was dealing narcotics and not paying taxes and DIAZ directed RUIZ to inform "Creeper" that they wanted a meeting with him.

(59) On or about November 14, 2004, defendant MAGALLON informed defendant DIAZ that he was going to collect taxes from a narcotics dealer named "Creeper."

18

1    (60)  On or about November 14, 2004, defendant NERIDA

2 told defendant DIAZ that he had collected $100 from a female who

3 wanted to begin paying taxes to the Ojeda Organization.

4    (61)  On or about November 15, 2004, defendant DIAZ and

5 defendant J. RUIZ discussed J. RUIZ's unsuccessful attempt to

6 collect tax money from the Devious Hoodlums gang and J. RUIZ said

7 he informed the Devious Hoodlums gang members that they were late

8 with their tax payments and would get the green light put back on

9 them if they did not pay.

10    (62)  On or about November 16, 2004, defendant BECERRA

11 told defendant DIAZ about a narcotics dealer who was operating a

12 high volume narcotics business out of a mobile home park in Santa

13 Ana, and BECERRA informed DIAZ that he thought the dealer was a

14 Mexican Mafia member or had the backing of a Mexican Mafia

15 member, even though defendant P. OJEDA informed BECERRA that he

16 was the only Mexican Mafia member in Orange County.

17    (63)  On or about November 17, 2004, defendants DIAZ and

18 BECERRA discussed a drive-by shooting that occurred between the

19 La Jolla and Plas gangs and BECERRA told DIAZ he would

20 investigate the shooting.

21    (64)  On or about November 19, 2004, defendant J. RUIZ

22 told defendant DIAZ that he was having difficulty finding anyone

23 from the Devious Hoodlums gang, and DIAZ said that the green

24 light would be put back on the gang if they did not contact J.

25 RUIZ.

26    (65)  On or about November 23, 2004, defendant DIAZ told

27 defendant J. RUIZ that the green light was back on the Devious

28 Hoodlums gang and that they have to pay double the taxes because

they had not contacted J. RUIZ.

(66)  On or about November 28, 2004, defendant TORRES called defendant DIAZ from the Orange County Jail and DIAZ and TORRES discussed that "Husky" from the "OTH" gang was going to pay a full $1,000 to DIAZ as a tax payment because "Husky" was trafficking narcotics into the Orange County Jail.

(67)  On or about November 29, 2004, defendants MEZA and DIAZ discussed a green light to assault "Lefty" from the 7th Street gang.

(68)  On or about December 12, 2004, defendant DIAZ, "Israel," a narcotics trafficker, and an Anaheim gang member discussed how much narcotics business "Cisco" was conducting in order for DIAZ to determine how much to demand in taxes from "Cisco."

(69)  On or about January 15, 2005, defendant DIAZ directed defendant MEZA to go into Southside gang territory to investigate who robbed the drug courier of a narcotics dealer protected by the Ojeda Organization.

(70)  On or about January 17, 2005, defendant MEZA informed defendant DIAZ about the results of MEZA's investigation into the robbery of the drug courier by Southside gang members.

(71)  On or about January 23, 2005, defendants BECERRA and DIAZ discussed taxing the Pauline Street gang and DIAZ told BECERRA that the payments were to be weekly.

All in violation of Title 18, United States Code, Section 1962(d).

COUNT TWO

[21 U.S.C. § 846]

A.   OBJECTS OF THE CONSPIRACY

18.   Beginning on or about a date unknown to the Grand Jury, but at least since January 2004, and continuing to in or about January 2005, in Orange County, within the Central District of California, and elsewhere, defendants PETER OJEDA, aka "Sana," aka "The Senor," aka "The Big Homie," aka "The Homie," aka "The Old Man," aka "The S Man" ("P. OJEDA"), MARCO DIAZ, aka "Slim" ("DIAZ"), MARIO SAUCEDO, aka "Clumsy" ("SAUCEDO"), DAVID TRUJILLO, aka "3D" ("TRUJILLO"), ARTHUR DURAN, aka "Chino" ("DURAN"), JOSE ARVIZU, aka "Sonny" ("ARVIZU"), ROBERT OCAMPO, aka "Wicked" ("OCAMPO"), OSCAR RUIZ, aka "Snipes," aka "Sniper" ("O. RUIZ"), FREDDIE LUEVANO, aka "Freaky" ("LUEVANO"), ABRAHAM MAGALLON, aka "Chema" ("MAGALLON"), ABEL AZEVEDO, aka "Babs" ("AZEVEDO"), JOSEPH CASTRO, aka "Joe" ("CASTRO"), LAWRENCE MORALES, aka "Larry" ("MORALES"), LONG NGUYEN, aka "Chino" ("NGUYEN"), ROBERT CERVANTES, aka "Gordo" ("CERVANTES"), JOSE MARTINEZ, aka "Huero" ("MARTINEZ"), SANDRA FLORES ("FLORES"), DIEGO MORENO ("MORENO"), MIA RODRIGUEZ ("RODRIGUEZ"), and others conspired and agreed with each other to knowingly and intentionally (a) possess with intent to distribute and (b) distribute approximately 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, a schedule II controlled substance, and approximately 100 grams or more of a mixture or substance containing a detectable amount of heroin, a Schedule I narcotic drug controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

21

B.   MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE ACCOMPLISHED

19.   The objects of the conspiracy were to be accomplished in substance as follows:

a.   Defendant P. OJEDA would arrange to purchase methamphetamine from defendant CASTRO and other sources.

b.   Defendant CASTRO would obtain methamphetamine in Mexico and elsewhere, and would deliver the methamphetamine to P. OJEDA, at times using couriers such as defendant NGUYEN.

c.   P. OJEDA would then sell methamphetamine, which he received from defendant CASTRO and other sources, to defendant MORALES and defendant DIAZ, so that MORALES and DIAZ could sell methamphetamine to their customers.

d.   Defendant CERVANTES would sell heroin to defendant DIAZ and others, at times using couriers, including defendant MARTINEZ and defendant FLORES, to deliver the heroin to DIAZ and his other customers.   CERVANTES would also purchase methamphetamine from DIAZ for CERVANTES to sell to his customers.

e.   Defendant DIAZ would sell methamphetamine to defendant SAUCEDO, defendant TRUJILLO, defendant DURAN, defendant ARVIZU, defendant OCAMPO, defendant O. RUIZ, defendant LUEVANO, defendant MAGALLON, defendant AZEVEDO, defendant MORENO, defendant RODRIGUEZ, defendant CERVANTES, and others, and would sell heroin to defendant MORENO and others, so that they could then sell the methamphetamine and heroin to their customers.

C.   OVERT ACTS

20.   In furtherance of the conspiracy and to accomplish the objects of the conspiracy, defendants P. OJEDA, DIAZ, SAUCEDO,

22

TRUJILLO, DURAN, ARVIZU, OCAMPO, O. RUIZ, LUEVANO, MAGALLON, AZEVEDO, CASTRO, MORALES, NGUYEN, CERVANTES, MARTINEZ, FLORES, MORENO, RODRIGUEZ, and others committed various overt acts in Orange County, within the Central District of California, including but not limited to the following:

(1)   On or about January 27, 2004, defendant P. OJEDA and defendant CASTRO discussed when CASTRO would be able to supply P. OJEDA with methamphetamine.

(2)   On or about January 28, 2004, defendant P. OJEDA advised defendant MORALES that he had methamphetamine to sell to MORALES.

(3)   On or about February 11, 2004, defendant CASTRO delivered methamphetamine to defendant P. OJEDA.

(4)   On or about February 11, 2004, defendant P. OJEDA distributed methamphetamine to defendant MORALES.

(5)   On or about February 16, 2004, defendant CASTRO informed P. OJEDA that CASTRO would have defendant NGUYEN deliver methamphetamine to P. OJEDA.

(6)   On or about February 19, 2004, defendant MORALES advised defendant P. OJEDA that the quantity of methamphetamine previously distributed by P. OJEDA to MORALES was missing four ounces.

(7)   On or about February 19, 2004, defendant P. OJEDA told defendant CASTRO that the quantity of the last delivery of methamphetamine from CASTRO was missing four ounces.

(8)   On or about April 15, 2004, defendant CERVANTES agreed to sell three ounces of heroin to a confidential informant ("the C/I") of the Santa Ana Gang Task Force and arranged for the

heroin to be delivered to the C/I.

(9) On or about April 15, 2004, defendant MARTINEZ delivered the three ounces of heroin from defendant CERVANTES to the C/I.

(10) On or about April 26, 2004, defendant P. OJEDA and defendant CASTRO arranged for the delivery of methamphetamine to P. OJEDA and P. OJEDA's payment to CASTRO for the methamphetamine.

(11) On or about April 26, 2004, defendant P. OJEDA and defendant MORALES discussed P. OJEDA supplying MORALES with methamphetamine.

(12) On or about May 12, 2004, defendant ARVIZU ordered a quantity of methamphetamine from defendant DIAZ.

(13) On or about May 14, 2004, defendant RODRIGUEZ ordered a quantity of methamphetamine from defendant DIAZ.

(14) On or about May 15, 2004, defendant CERVANTES and defendant DIAZ discussed how much DIAZ would charge CERVANTES for various quantities of methamphetamine.

(15) On or about May 19, 2004, defendant P. OJEDA ordered a two pound quantity of methamphetamine from defendant CASTRO.

(16) On or about May 19, 2004, defendant NGUYEN and defendant P. OJEDA arranged for NGUYEN to deliver the two pounds of methamphetamine from defendant CASTRO to P. OJEDA.

(17) On or about May 19, 2004, defendant P. OJEDA sold a pound quantity of methamphetamine to the C/I.

(18) On or about May 23, 2004, defendant RODRIGUEZ and defendant DIAZ discussed the quality of methamphetamine DIAZ was

24

going to sell RODRIGUEZ.

(19)  On or about May 27, 2004, defendant CERVANTES agreed to sell three ounces of heroin to the C/I and arranged for the heroin to be delivered to the C/I.

(20)  On or about May 29, 2004, defendant AZEVEDO ordered a quantity of methamphetamine from defendant DIAZ.

(21)  On or about June 1, 2004, defendant P. OJEDA ordered methamphetamine from defendant CASTRO.

(22)  On or about June 1, 2004, defendant DIAZ and defendant P. OJEDA discussed P. OJEDA obtaining methamphetamine to supply to DIAZ.

(23)  On or about June 1, 2004, defendant DIAZ advised defendant OCAMPO that he was waiting on his supplier to deliver methamphetamine so that DIAZ could then supply OCAMPO with methamphetamine.

(24)  On or about June 1, 2004, defendant P. OJEDA advised defendant MORALES that he would be receiving more methamphetamine that day and could then supply MORALES with methamphetamine.

(25)  On or about June 1, 2004, defendant NGUYEN transported methamphetamine from defendant CASTRO to be delivered to defendant P. OJEDA.

(26)  On or about June 2, 2004, defendant DIAZ and defendant P. OJEDA discussed defendant NGUYEN getting arrested on June 1, 2004, with two pounds of methamphetamine.

(27)  On or about June 9, 2004, defendant P. OJEDA told defendant DIAZ he was arranging to obtain methamphetamine and DIAZ requested that P. OJEDA contact him when P. OJEDA received

25

the methamphetamine.

        (28)   On or about June 11, 2004, defendant O. RUIZ and defendant DIAZ arranged for O. RUIZ to pick up methamphetamine from DIAZ.

        (29)   On or about June 11, 2004, defendant DIAZ told defendant O. RUIZ to return the methamphetamine DIAZ had just supplied to O. RUIZ because it was of questionable quality.

        (30)   On or about June 11, 2004, defendant P. OJEDA contacted defendant DIAZ to inform him that the methamphetamine P. OJEDA had supplied to DIAZ was worthless and that P. OJEDA would retrieve the methamphetamine from DIAZ.

        (31)   On or about June 12, 2004, defendant DIAZ ordered a quantity of heroin from defendant CERVANTES.

        (32)   On or about June 13, 2004, defendant MORENO and defendant DIAZ discussed how much DIAZ would charge MORENO for a quantity of methamphetamine.

        (33)   On or about June 16, 2004, defendant MORENO ordered a quantity of methamphetamine from defendant DIAZ and informed DIAZ that he would be making a future purchase of heroin from DIAZ.

        (34)   On or about June 21, 2004, defendant OCAMPO ordered a quarter pound of methamphetamine from defendant DIAZ.

        (35)   On or about August 20, 2004, defendant RODRIGUEZ asked defendant DIAZ's advice regarding how much to charge a buyer for a quantity of methamphetamine that DIAZ had previously supplied to her.

        (36)   On or about August 26, 2004, defendant TRUJILLO ordered a quantity of methamphetamine from defendant DIAZ.

26

(37)   On or about August 29, 2004, defendant DIAZ ordered a quantity of heroin from defendant CERVANTES.

(38)   On or about August 29, 2004, defendant FLORES and defendant DIAZ arranged for FLORES to deliver the heroin from defendant CERVANTES to DIAZ.

(39)   On or about September 3, 2004, defendant DIAZ ordered a quantity of heroin from defendant CERVANTES.

(40)   On or about September 3, 2004, defendant FLORES and defendant MARTINEZ arranged to deliver the heroin from defendant CERVANTES to defendant DIAZ.

(41)   On or about September 3, 2004, defendant O. RUIZ ordered a quantity of methamphetamine from defendant DIAZ.

(42)   On or about September 4, 2004, defendant DIAZ directed defendant TRUJILLO to advance a quantity of methamphetamine to an unindicted co-conspirator and await payment until the unindicted co-conspirator sold the methamphetamine.

(43)   On or about September 4, 2004, defendant MORENO ordered a quantity of heroin from defendant DIAZ.

(44)   On or about September 6, 2004, defendant AZEVEDO ordered a quantity of methamphetamine from defendant DIAZ.

(45)   On or about September 10, 2004, defendant TRUJILLO ordered a quantity of methamphetamine from defendant DIAZ.

(46)   On or about September 10, 2004, defendant MAGALLON ordered a quantity of methamphetamine from defendant DIAZ.

(47)   On or about September 17, 2004, defendant CERVANTES and defendant DIAZ arranged for defendant MARTINEZ to deliver heroin to DIAZ.

(48)   On or about October 2, 2004, defendant RODRIGUEZ

27

ordered a quantity of methamphetamine from defendant DIAZ.

(49)   On or about October 7, 2004, defendant LUEVANO ordered a quantity of methamphetamine from defendant DIAZ.

(50)   On or about October 8, 2004, defendant ARVIZU ordered a quantity of methamphetamine from defendant DIAZ.

(51)   On or about October 28, 2004, defendant DURAN and defendant DIAZ discussed the prices for various quantities of methamphetamine.

(52)   On or about October 30, 2004, defendant MAGALLON ordered a quantity of methamphetamine from defendant DIAZ.

(53)   On or about November 6, 2004, defendant DURAN ordered a quantity of methamphetamine from defendant DIAZ.

(54)   On or about November 7, 2004, defendant SAUCEDO requested a quantity of methamphetamine from defendant DIAZ for SAUCEDO to pick up and deliver to an unindicted co-conspirator.

(55)   On or about November 12, 2004, defendant SAUCEDO ordered a quantity of methamphetamine from defendant DIAZ.

(56)   On or about November 14, 2004, defendant MAGALLON ordered a quantity of methamphetamine from defendant DIAZ.

(57)   On or about November 21, 2004, defendant RODRIGUEZ informed defendant DIAZ that she had three buyers for methamphetamine.

(58)   On or about November 29, 2004, defendant SAUCEDO informed defendant DIAZ that an unindicted co-conspirator wanted a quantity of methamphetamine.

(59)   On or about December 4, 2004, defendant MAGALLON asked defendant DIAZ to inform him when DIAZ got another supply of methamphetamine so that MAGALLON could take care of his

28

customers.

(60)   On or about December 4, 2004, defendant P. OJEDA informed defendant DIAZ that P. OJEDA had methamphetamine to supply to DIAZ.

(61)   On or about December 4, 2004, defendant DIAZ and defendant MAGALLON arranged for DIAZ to distribute methamphetamine to MAGALLON.

(62)   On or about December 12, 2004, defendant DURAN ordered a quantity of methamphetamine from defendant DIAZ.

(63)   On or about January 8, 2005, defendant FLORES arranged to deliver a quantity of heroin to defendant DIAZ.

(64)   On or about January 22, 2005, defendant DIAZ supplied defendant LUEVANO with a quantity of methamphetamine.

All in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

COUNT THREE

[21 U.S.C. § 841((a)(1)]

21.  On or about May 19, 2004, in Orange County, within the
Central District of California, defendant PETER OJEDA, aka
"Sana," aka "The Senor," aka "The Big Homie," aka "The Homie,"
aka "The Old Man," aka "The S Man," knowingly and intentionally
distributed approximately 399.2 grams of methamphetamine, a
Schedule II controlled substance.


A TRUE BILL

Foreperson


DEBRA WONG YANG
United States Attorney

STEVEN D. CLYMER
Special Assistant United States Attorney
Chief, Criminal Division

WAYNE R. GROSS
Assistant United States Attorney
Chief, Santa Ana Branch Office

30